UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
ADP DEALER SERVICES, INC.,                           MEMORANDUM AND ORDER

        Plaintiff,                               09 Civ. 0185 (ILG) (RER)

   - against -

PLANET AUTOMALL, INC.,

        Defendant.
------------------------------------------------------x
GLASSER, Senior United States District Judge:

    Plaintiff ADP Dealers Services, Inc., ("ADP") brings this diversity action for breach of contract and unjust enrichment against defendant Planet Automall, Inc. ("Automall") in connection with three agreements the parties executed in 2007. Currently before the Court is ADP's motion for summary judgment on its breach of contract claim and Automall's affirmative defenses. For the reasons that follow, ADP's motion is hereby granted.

## I. BACKGROUND

    The facts of this action are relatively simple, and unless otherwise noted, are undisputed. ADP, a Delaware corporation with its principal place of business in Rhode Island, provides digital marketing, internet, and related services to automobile dealerships. Compl. dated Oct. 27, 2008 ¶ 1 (Dkt. No. 1).[1] Automall, a New York corporation with its principal place of business in Long Island City, New York, is an

---

[1] By Order dated July 27, 2011, Magistrate Judge Reyes substituted ADP Dealer Services, Inc. for ADP, Inc. as plaintiff in this action. Like ADP, Inc., ADP Dealer Services is also a Delaware corporation. Letter to Magistrate Judge Reyes dated July 15, 2011 Ex. C (Dkt. No. 15).

1

automobile dealership owned and operated by Kinney Galani ("Galani"). Compl. ¶ 2; Declaration of Gene Loop dated Apr. 15, 2010 ("Loop Decl.") ¶ 3 (Dkt. No. 33). Galani also owns and operates other automobile dealerships, including one called KG Suzuki located on the same premises as Automall in Long Island City. Loop Decl. ¶ 3.

On or about August 30, 2007, Galani executed on behalf of Automall a digital marketing services agreement ("DMS agreement") with BZ Results ("BZ"), one of ADP's subdivisions. Plaintiff's Rule 56.1 Statement ("Pl.'s 56.1 Statement") ¶ 1 (Dkt. No. 37); Declaration of Kinney Galani in Opposition to Summary Judgment dated June 14, 2010 ("Galani Decl.") ¶ 1 (Dkt. No. 42). The DMS agreement obligated BZ to, among other things, design a website for Automall in exchange for payment of $3,300.00 per month for a non-cancelable period of 36 months. Pl.'s 56.1 Statement ¶ 2; Loop Decl. Ex. A, at 10 ¶¶ 2(b), 3(b). Galani testified during his deposition, however, that it was his understanding that the agreement did not have a 36 month term but instead a "30-day out." Declaration of Michael S. Re dated Apr. 16, 2010 ("Re Decl.") Ex. F. (Galani Dep.), at 182 (Dkt. No. 35). After Galani approved BZ's design of the Automall website in mid-September 2007, it became operational and began receiving visitor traffic. Pl.'s 56.1 Statement ¶¶ 3-5. Although the DMS agreement was initially drafted for KG Suzuki, according to Gene Loop ("Loop"), one of BZ's sales executives, Galani eventually decided that he wanted a new website for Automall instead, and the unexecuted draft agreement between KG Suzuki and BZ ultimately became the agreement between Automall and BZ—the agreement that Galani executed. Loop Decl. ¶ 6. Galani claims that the DMS agreement was to provide for the creation of a joint website for both Automall and KG Suzuki and that Loop and Rick Friedman ("Friedman"), another BZ employee,

2

represented as much during negotiations before the agreement's execution. Galani Decl. ¶ 5. Loop and Friedman deny making any such representation. Loop Decl. ¶ 9; Declaration of Rick Friedman dated Apr. 15, 2010 ("Friedman Decl.") ¶ 7 (Dkt. No. 32). They do acknowledge, however, that BZ eventually provided KG Suzuki with certain services as a professional courtesy, including a redesign of the KG Suzuki website that became operational on January 24, 2008. Loop Decl. ¶¶ 17-18, 20; Friedman Decl. ¶ 8.

Galani later executed on behalf of Automall a search engine marketing agreement ("SEM agreement") with BZ. Pl.'s 56.1 Statement ¶ 15; Loop Decl. Ex. C.[2] The SEM agreement obligated BZ, among other things, to create a search engine optimization campaign for Automall in exchange for a monthly payment of $3,000 for an initial term of 12 months. Pl.'s 56.1 Statement ¶¶ 15-17; Loop Decl. Ex. C, at 2 ¶ 2.[3] Beginning in October 2007, BZ's search engine marketing campaign became operational. Pl.'s 56.1 Statement ¶ 19. ADP claims that the campaign became operational pursuant to the SEM agreement, id., while Automall claims, based on alleged discussions with Loop, that the search engine optimization services were included as part of the DMS agreement.

---

[2] It is unclear when precisely Galani executed the SEM agreement. ADP states that he did so on September 25, 2007, and the SEM agreement itself bears this date. Pl.'s 56.1 Statement ¶ 15. Although Galani stipulated during his deposition that he did in fact execute the agreement "at some point," it is unclear when he did so. Re Decl. Ex. F. (Galani Dep.), at 171-72.

[3] Search engine optimization "basically means taking steps to ensure that your website is shown first, or as close to first as possible, when the topic of your website is searched for on an internet search engine such as Google or Yahoo!." Ascentive, LLC v. Opinion Corp., No. 10 Civ. 4433 (ILG) (SMG), 2011 WL 6181452, at *2 n.5 (E.D.N.Y. Dec. 13, 2011) (citation and internal quotation marks omitted).

Defendant's Rule 56.1 Statement ("Def.'s 56.1 Statement") ¶ 19 (Dkt. No. 41); Galani Decl. ¶ 7.

On or about October 3, 2007, Galani executed on behalf of Automall a third agreement with BZ—a "virtual salesperson" agreement ("VS agreement"). Pl.'s 56.1 Statement ¶ 22-23; Loop Decl. Ex. D. In exchange for monthly payments of $195, BZ agreed to equip Automall's website with a video tour guide feature that leads customers through the site. Loop Decl. Ex. D. The term of the agreement was to be coterminous with the term of the "Digital Marketing Agreement previously executed" by Automall—the DMS agreement. Id. Automall claims that the tour guide feature was to be included as part of the DMS agreement—again, based, among other things, on discussions with BZ employees. Def.'s 56.1 Statement ¶ 22; Galani Decl. ¶ 7.

BZ billed Automall for the services and products provided pursuant to each of the agreements. Declaration of Eric L. Pearson dated Apr. 15, 2010 ("Pearson Decl.") ¶ 13 (Dkt. No. 34). Billing and invoicing under the various agreements began on September 30, 2007 for the DMS agreement and on October 31, 2007 for the VS and SEM agreements. Id. ¶ 13-14. Galani on behalf of Automall received monthly invoices through May 2008 which Automall failed to pay. Pl.'s 56.1 Statement ¶ 29.

After making a number of fruitless attempts to collect payment, ADP on October 27, 2008 filed suit in the U.S. District Court for the District of Rhode Island, asserting claims for breach of contract and unjust enrichment and seeking damages of $159,594.27, the amount due under the various agreements between BZ and Automall,

along with interest, attorney's fees and costs. Compl. ¶¶ 13-19; Pearson Decl. ¶ 21.[4] Automall filed its answer on December 15, 2008, asserting several affirmative defenses.[5] By consent order dated January 16, 2009, the action was transferred to this district.

ADP on April 16, 2010 filed its submissions in support of summary judgment on its breach of contract claim and Automall's affirmative defenses. Plaintiff's Memorandum of Law in Support of Summary Judgment dated Apr. 16, 2010 ("Pl.'s Mem.") (Dkt. No. 36). After being granted several extensions to do so, Automall on June 18, 2010 filed its opposition papers. Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment dated June 17, 2010 ("Def.'s Opp'n") (Dkt. No. 51). On July 28, 2010, ADP filed its reply. Reply Memorandum of Law in Further Support of Plaintiff's Motion for Summary Judgment dated July 28, 2010 (Dkt. No. 55).

## II. DISCUSSION

ADP maintains that summary judgment on its breach of contract claim is appropriate because the language of the relevant agreements is clear and unambiguous and there is no dispute that (1) Galani executed the agreements on behalf of Automall; (2) ADP performed its obligations under the agreements; and (3) Automall refused to

---

[4] There appears to be a discrepancy in the amount of damages ADP seeks. ADP's complaint states that ADP seeks $159,594.27 plus interest, attorney's fees, and costs, Compl. ¶ 12, while the Pearson Declaration states that ADP seeks $171,426.88 along with interest, attorney's fees, and costs, Pearson Decl. ¶ 21.

[5] Automall on June 29, 2009 supplemented the answer by filing a counterclaim for breach of contract. The parties on October 5, 2009 consented to the dismissal of the counterclaim with prejudice pursuant to Fed. R. Civ. P. 41(a)(2) and 41(c). The Court so orders this stipulation, and Automall's counterclaim is therefore dismissed with prejudice.

pay ADP for the services it received. Pl.'s Mem. at 3-5. ADP further argues that the parol evidence rule bars Automall's attempts to use Galani's statements concerning alleged pre-contractual discussions to vary the agreements' terms or to create issues of material fact that would preclude summary judgment. Pl.'s Mem. at 6. The Court turns to these contentions below.

### A. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law.'" Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010) (quoting Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008)).

The moving party bears the burden of establishing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. Id. at 322-23. To defeat a motion for summary judgment, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,'" Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)), and cannot "'rely

6

on conclusory allegations or unsubstantiated speculation.'" Id. (quoting Fed. Deposit Ins. Corp. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010)).

A court deciding a motion for summary judgment must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (quoting Williams v. R.H. Donnelley Corp., 368 F.3d 123, 126 (2d Cir. 2004)). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).

Moreover, in cases such as this one involving the interpretation of contractual terms, summary judgment is appropriate only if the language of the contract is plain and unambiguous, considered in light of the context and structure of the agreement as a whole. See, e.g., Miller Marine Servs., Inc. v. Travelers Prop. Cas. Ins. Co., No. 04 Civ. 5679 (ILG), 2005 WL 2334385, at *5 n.3 (E.D.N.Y. Sept. 23, 2005) (citing Brass v. Am. Film Techs., Inc., 987 F.2d 142, 148-49 (2d Cir. 1993)). The threshold issue here is whether the language of the DMS, SEM, and VS agreements is unambiguous. Under both New Jersey and Rhode Island law, this inquiry also bears on whether the Court may consider extrinsic evidence in determining the meaning of the agreements—as Automall contends it must. See, e.g., Def.'s Opp'n at 3.[6]

---

[6] A federal court sitting in diversity applies the choice of law rules of the state in which it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941). Under New York Law, "[a]bsent fraud or a violation of public policy, a court is to apply the law selected in the contract as long as the state selected has

**B. Breach of Contract**

Whether the Court applies New Jersey or Rhode Island law, the same principles of contract interpretation guide the construction of the agreements at issue in this case. The Court will first determine as a matter of law which category the agreements' terms fall into—clear or ambiguous. Hill v. Commerce Bancorp, Inc., No. 09 Civ. 3685 (RBK) (JS), 2010 WL 2539696, at *5 (D.N.J. June 17, 2010) (citing Schor v. FMS Fin. Corp., 357 N.J. Super. 185, 814 A.2d 1108, 1112 (App. Div. 2002) and Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980)); Garden City Treatment Ctr., Inc. v. Coordinated Health Partners, Inc., 852 A.2d 535, 541 (R.I. 2004). A term is "ambiguous if it is subject to reasonable alternative interpretations." Taylor v. Cont'l Grp. Change in Control Severance Pay Plan, 933 F.2d 1227, 1232 (3d Cir. 1991); accord Garden City, 852 A.2d 542 ("[T]he question is not whether there is an ambiguity in the metaphysical sense, but whether the language has only one reasonable meaning when construed, not in a hypertechnical fashion, but in an ordinary, common sense manner.").

If a court determines that contractual language is ambiguous, "New Jersey law permits this Court to consider extrinsic evidence 'in determining the intent and meaning

---

sufficient contacts with the transaction." Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 393 (2d Cir. 2001). Neither party disputes the applicability of New Jersey law to the DMS agreement, which states that it is governed by New Jersey law, and VS agreement (which incorporates by reference the DMS agreement) and the applicability of Rhode Island law to the SEM agreement, which states that it is governed by Rhode Island Law. Loop Decl. Exs. A., at 10 ¶ 14, Ex. C., at 4 ¶ 7, Ex. D. Accordingly, ADP's contract claim with respect to the DMS and VS agreements is governed by New Jersey law and its contract claim with respect to the SEM agreement is governed by Rhode Island law.

of the contract,'" but this evidence cannot be used "'to vary the [written] terms of the'" agreement. Nye v. Ingersoll Rand Co., 783 F. Supp. 2d 751, 761 (D.N.J. 2011) (quoting Conway v. 287 Corporate Ctr. Assocs., 187 N.J. 259, 269-270, 901 A.2d 341 (2006)). The same is true under Rhode Island law. See, e.g., Clark-Fitzpatrick, Inc./Franki Foundation Co. v. Gill, 652 A.2d 440, 443 (R.I. 1994) ("In situations in which the language of a contractual agreement is plain and unambiguous, its meaning should be determined without reference to extrinsic facts or aids." (citing Greenwald v. Selya & Iannuccillo, 491 A.2d 988, 989 (R.I. 1985))).

Automall maintains that the agreements at issue in this case are ambiguous and therefore that summary judgment on ADP's breach of contract claims is inappropriate. Def.'s Opp'n at 3.[7] It contends, moreover, that extrinsic evidence of, among other things, Galani's negotiations with BZ personnel illuminates the meaning of the agreements and must be considered by a jury. Def.'s Opp'n at 3-6. The Court disagrees. Whether the language of a contract is ambiguous is a matter of law for determination by the Court, Nye, 783 F. Supp. 2d at 759; accord Garden City, 852 A.2d at 541, and the Court concludes that none of the agreements at issue in this case is ambiguous or requires the consideration of extrinsic evidence by the jury.

---

[7] Automall argues that the SEM agreement is "incomprehensible and unenforceable," but fails to point to any language in the agreement that is subject to reasonable alternative interpretations. Def.'s Opp'n at 3. Automall also fails to point to any ambiguous language in the DMS agreement and instead merely makes the assertion in a conclusory fashion. Id. ("Plaintiff's Memorandum of Law erroneously contends the two agreements are 'clear and unambiguous, . . . . Since they aren't, extrinsic evidence is admissible to demonstrate the intent of the parties under New Jersey law, since the contracts are capable of more than one reasonable interpretation.") (emphasis added).

9

The DMS agreement names "Planet Automall" as the party contracting with BZ and, in exchange for BZ's services, obligates Automall for a non-cancelable term of 36 months beginning on the date of the agreement's acceptance, August 30, 2007, to make a "total monthly payment of $3,300.00." Loop Decl. Ex. A., at 10 ¶ 2, 3(b). The SEM agreement also names "Planet Automall" and provides that it "agrees to pay BZ the Total System Contract Price," a monthly payment of $3,000 over a term of 12 months. Loop Decl. Ex. C, at 1, 2. The VS agreement names "Planet Automall" as well and provides that for a monthly fee of $195, BZ will provide Automall with a "video tour guide" for its website. Loop Decl. Ex. D. It also provides that "BZ and Client [Automall] agree that the Term of this Agreement shall be co-terminus with the Term of the Client's existing Digital Marketing Agreement previously executed by Client [Automall]." Loop Decl. Ex. D. Accordingly, the VS agreement, like the DMS agreement—the digital marketing agreement previously executed by Automall—has a 36 month term. The key provisions of each of these agreements are not subject to more than one reasonable interpretation, and the Court therefore may not consider extrinsic evidence in interpreting them. See, e.g., Nye, 783 F. Supp. 2d at 761; Clark-Fitzpatrick, 652 A.2d at 443. Automall, nevertheless, seeks to have the Court do just that.

With respect to the DMS agreement, Automall, relying on statements in Galani's declaration concerning certain conversations he allegedly had with BZ representatives, argues that the agreement (1) was cancelable on 30 days notice to BZ; (2) applied to KG Suzuki in addition to Automall; (3) also encompassed the provisions of the SEM and VS agreements; (4) cost only $3,000 per month; and (5) did not commence until March 1, 2008. Def.'s Opp'n at 1-5. These contentions are belied by the plain and unambiguous

10

language of the DMS Agreement, and any purported statements made by BZ representatives to Galani may not be used to rewrite the DMS agreement's terms. This is particularly true here because the DMS agreement contains a merger clause, Loop Decl. Ex. A, at 10 ¶ 10, further evidence that the agreement is integrated and constitutes the final and complete expression of Automall and BZ's agreement. <u>See, e.g.</u>, <u>Telecom Int'l. Am., Ltd. v. Am. Tel. & Tel. Corp.</u>, 280 F.3d 175, 191 (2d Cir. 2001) (noting that "under New Jersey law, the presence of an unequivocal and conspicuous integration clause further strengthens the presumption of completeness and is nearly dispositive" and affirming district court's refusal to consider extrinsic evidence in interpretation of contract).

Automall's attempt to inject ambiguity into the SEM agreement also fails. Automall argues first that the SEM agreement never "commenced" because Automall never paid BZ pursuant to the agreement. Def.'s Opp'n at 3. Automall relies on the following provision of the SEM agreement in support of its position:

> **Starts [sic] Date** BZ Results shall commence service under this Statement of Work immediately upon its receipt from the Client <u>and required payment</u>. BZ Results shall be under no obligation to submit "Structure Pages" to Search Engines until Initial Payment has been received from Client.

Loop Decl. Ex. C, at 2 (emphasis added). This contention is meritless. The "required payment" refers to fees for a "BZ Search Engine Marketing Micro-site" and for "BZ Search Monthly Service" in the Statement of Work section of the SEM Agreement—all of which BZ waived. Loop Decl. Ex. C, at 1. The required payment is not, as Automall contends, the $3,000 monthly fee provided for in the SEM agreement. Def.'s Opp'n at 4. Indeed, interpreting the agreement in this

11

fashion would render superfluous paragraph 3 of the agreement which obligates Automall to pay $3,000 per month to BZ, over a term of 12 months, Loop Decl. Ex. C, at 1, 2. Moreover, although Automall, again relying on Galani's declaration, contends that the SEM agreement is "incomprehensible and unenforceable," Def.'s Opp'n at 3; Galani Decl. ¶ 23, Galani testified during his deposition that he read and understood the agreement before signing it:

> Q. Did you say that you read [the SEM agreement] before you signed it.
>
> A. Yes, I read it.
>
> Q. Did you understand it?
>
> A. I understood it very clearly, and it was part of the $3000 of the original. This does not say —
>
> Q. Where does it say that it's part of the $3000 in that document?
>
> A. Where does it say that it's not part of the $3000 package?

Reply Declaration of Michael S. Re dated July 28, 2010 Ex. A (Galani Dep.), at 137-8.

Likewise, to the extent that Automall contends that the Court should consider extrinsic evidence of purported fraudulent misrepresentations by BZ personnel during negotiations with Galani, Def.'s Opp'n at 6, the Court finds this contention unpersuasive. While it is true, as Automall argues, that the introduction of extrinsic evidence to prove fraud in the inducement is a well-recognized exception to the parol evidence rule, Def.'s Opp'n at 7, "a party may not seek to contradict the express terms of a writing to avoid obligations he knowingly assumes." Alexander v. CIGNA Corp., 991 F. Supp. 427, 436 (D.N.J. 1998) (citing Winoka Vill. v. Tate, 16 N.J. Super. 330, 333-34, 84

A.2d 626 (App. Div. 1951)).[8] Indeed, where, the alleged misrepresentations pertain to "matters expressly addressed in the integrated writing" the exception does not apply. Filmlife, 251 N.J. Super. at 598; accord Fr. Winkler KG v. Stoller, 839 F.2d 1002, 1006 (3d Cir. 1988) (affirming summary judgment on breach of contract claim where extrinsic evidence that plaintiff made allegedly fraudulent mispresentations to defendant barred as "attempt to contradict, alter, or modify the terms of an integrated contract" that "would do more than simply modify the [contract's] terms; it would utterly extinguish them"); Ramada Worldwide, Inc. v. Hotel of Grayling, Inc., No. 08 Civ. 3845 (KSH), 2010 WL 2674460, at *7 (D.N.J. June 30, 2010) (barring purportedly fraudulent statements made during negotiations because they related to matters addressed in agreement containing merger clause and granting summary judgment on breach of contract claim).

That is precisely the situation presented here. The DMS agreement, like the agreements at issue in Stoller and Ramada constitutes the final written expression of the parties' agreement. Its merger clause provides that it "contains the entire agreement and understanding between between [Automall] and BZ . . . and supersedes any and all agreement or understanding, whether written or oral relating thereto." Loop Decl. Ex.

---

[8] The parol evidence rule bars the introduction of oral evidence to alter or vary the terms of an integrated written agreement. See, e.g., Filmlife, Inc. v. Mal "Z" Ena, Inc., 251 N.J. Super. 570, 572, 598 A.2d 1234 (App. Div. 1991) (citation omitted). Put differently, "[w]here the contract or agreement is unambiguous, parol evidence of prior inconsistent terms or negotiations is inadmissible to demonstrate intent of the parties." Harley-Davidson, Inc. v. Morris, 19 F.3d 142, 148 (3d Cir. 1994).

A, at 10 ¶ 10.[9] Moreover, all of the purported misrepresentations—including that the DMS agreement applied to KG Suzuki in addition to Automall, was cancelable after 30 days, and cost $3,000 per month—are expressly contradicted by the DMS agreement. See Galani Decl. ¶¶ 3, 5; Loop Decl. Ex. A, at 10. Accordingly, even if Galani's statements concerning purported fraudulent representations by BZ representatives are true, they are barred by the parol evidence rule.[10]

Having concluded that the agreements at issue in the case are unambiguous and therefore that summary judgment on ADP's breach of contract claim is permissible, the Court next turns to whether ADP has established each of the elements of the claim. A breach of contract claim requires a plaintiff to show: (1) the existence of a valid contract; (2) a breach of that contract; and (3) resulting damage to the plaintiff. See, e.g., Ramada

---

[9] Galani's purported failure to read the DMS agreement before signing it on behalf of Automall is irrelevant. See, e.g., Raiczyk v. Ocean Cnty. Veterinary Hosp., 377 F.3d 266, 270 (3d Cir. 2004) ("[I]t is well settled that signing a contract creates a 'conclusive presumption that the signer read, understood, and assented to its terms.'" (quoting Fleming Cos. v. Thriftway Medford Lakes, Inc., 913 F. Supp. 837, 843 (D.N.J. 1995))).

[10] Automall's claim that the DMS agreement created a fiduciary relationship between the parties in light of its inclusion of language such as "Partnership Pricing" and "Partner Statement" in the agreement's various headings, Def.'s Opp'n at 2, is also meritless. If Automall's standard for finding a fiduciary duty were correct, then a very large number of ordinary contracts would result in fiduciary relationships between parties. In any event, Automall cites no authority for this proposition and does not even attempt to articulate how this language results in a relationship in which "one party places trust and confidence in another who is in a dominant or superior position." Hunter v. Sterling Bank, Inc., No. 09 civ. 172 (FLW), 2011 WL 5921388, at *7 (D.N.J. Nov. 28, 2011) (describing fiduciary relationship as arising "between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship" (citing F.G. v. MacDonell, 150 N.J. 550, 563-64, 696 A.2d 697 (1997))).

Worldwide, Inc. v. Kim, No. 09 Civ. 4534 (WHW), 2010 WL 2879611, at *3 (D.N.J. July 15, 2010) (citing AT & T Credit Corp. v. Zurich Data Corp., 37 F. Supp. 2d 367, 370 (D.N.J. 1999)); Gorman v. St. Raphael Academy, 853 A.2d 28, 33 (R.I. 2004).  There is no question that the undisputed facts establish each of these elements.  Galani, on behalf of Automall, executed the DMS, SEM, and VS agreements, which obligated Automall to provide payment to ADP in exchange for certain digital marketing services.  Loop Decl. Exs. A, C, D.  ADP performed its obligations under the agreements.  See, e.g., Loop Decl. ¶¶ 14-15; Pearson Decl. ¶¶ 4-5.  Automall breached its obligations under the agreements by failing to pay the amounts due under the monthly invoices that ADP sent to it for the billing periods beginning in September 30, 2007 and continuing through May 31, 2008.  Pl.'s 56.1 Statement ¶ 29.  And ADP suffered monetary damages as a result of Automall's default under the agreements.  Loop Decl. Exs. A, C, D; Pearson Decl. ¶¶ 21-25.  ADP's motion for summary judgment on its breach of contract claim is therefore granted.

ADP's motion for summary judgment with respect to Automall's affirmative defenses is granted as well, and these defenses are dismissed.  Automall asserts a laundry list of defenses in its answer including:  (1) failure to state a claim; (2) insufficiency of service of process; (3) waiver; (4) estoppel; (5) lack or failure of consideration; and (6) fraudulent inducement but, except for its fraudulent inducement defense, Automall has made no arguments in opposition to ADP's motion and has therefore abandoned these defenses.  See, e.g., Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary

judgment fails to address the argument in any way."). Automall's fraudulent inducement defense fails not only because it is insufficiently pled under Fed. R. Civ. P. 9(b), <u>MM Arizona Holdings LLC v. Bonanno</u>, 658 F. Supp. 2d 589, 594 (S.D.N.Y. 2009) (Rule 9(b) applies to affirmative defenses alleging fraud), but also because Automall has failed to offer any "hard evidence showing that its version of the events is not wholly fanciful." <u>D'Amico v. City of New York</u>, 132 F.3d 145, 149 (2d Cir. 1998).[11] Indeed, Automall has only come forward with conclusory and self-serving statements from Galani in support of its defense. <u>See, e.g.</u>, Galani Decl. ¶ 5 ("I relied upon the representations of LOOP and FRIEDMAN before executing the DMS agreements . . . ."). Though Automall identifies Loop and Friedman as the BZ employees who made the alleged misrepresentations, it fails to identify a specific statement, made on a specific day, that constituted a fraud. Nor does it explain how its reliance on the misrepresentations was reasonable. Automall thus has failed to raise a genuine dispute of material fact with respect to its fraudulent inducement defense, and it, like its other defenses, is therefore dismissed. <u>See, e.g.</u>, <u>Arizona Holdings</u>, 658 F. Supp. 2d at 594-95 (summary judgment granted as to fraudulent inducement defense where only evidence supporting defense was conclusory and self-serving statements of defendants).

Because the Court has concluded that ADP is entitled to recover on its breach of contract claim, it need not reach ADP's unjust enrichment claim as a plaintiff seeking

---

[11] The elements of fraudulent inducement are: "(1) a material misrepresentation of a presently existing or past fact, (2) made with knowledge of its falsity, (3) with the intention that the other party rely thereon, [and] (4) resulting in reliance by that party to his detriment." <u>Standard Office Sys. v. U.S. Exp. Leasing, Inc.</u>, No. 10 Civ. 01427 (SDW) (MCA), 2011 WL 223472, at *7 (D.N.J. Jan. 24, 2012) (citations omitted); <u>accord</u> <u>Women's Dev. Corp. v. City of Cent. Falls</u>, 764 A.2d 151, 160 (R.I. 2001).

compensation for the same injury under different legal theories is only entitled to one recovery. See, e.g., Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 218 (3d Cir. 1992) ("Simply because [plaintiff] was able to wrap that loss into several different legal theories of recovery does not entitle it to recoup twice."). The Court refers this case to Magistrate Judge Reyes for an inquest to determine the appropriate damage award, including ADP's request for attorney's fees and any pre-judgment interest.[12]

### III.     CONCLUSION

For all of the foregoing reasons, ADP's motion for summary judgment is hereby GRANTED, and Automall's affirmative defenses are hereby DISMISSED. This case is referred to Magistrate Judge Reyes for an inquest to determine the appropriate damage award.

SO ORDERED.

Dated:      Brooklyn, New York
            January 12, 2012

                                                    /s/
                                            I. Leo Glasser
                                            Senior United States District Judge

---

[12] The DMS agreement provides that upon Automall's default, it "agrees to pay all expenses collecting such payments due including, without limitation, reasonable expenses and fees of legal counsel, court costs and the cost of appellate proceedings." Loop Decl. Ex. A, at 10 ¶ 4 (emphasis added). The SEM agreement contains an identical provision. Loop Decl. C, at 4 ¶ 3. ADP's reasonable attorney's fees and costs should therefore be considered in determining the appropriate damage award. See, e.g., Alyeska Pipeline Servs. Co. v. Wilderness Soc'y, 421 U.S. 240, 247, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975) (absent statutory obligation, enforceable contractual obligation, or a situation involving willful disobedience of a court order, litigants generally pay their own attorney's fees); Alcoa Edgewater No. 1 Fed. Credit Union v. Carroll, 44 N.J. 442, 448, 210 A.2d 68 (1965); Kells v. Town of Lincoln, 874 A.2d 204, 214 (R.I. 2005)). Although ADP seeks pre-judgment interest on its claims, Compl. ¶ 12, it has articulated no legal basis for such an award in the submissions currently before the Court.